UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

BRADLEY LEATHERMAN,       )

            )

        Petitioner,     )    Case No. 4:06-cv-121

            )

v.             )    Honorable Paul L. Maloney

            )

CARMEN D. PALMER,      )

            )    **REPORT AND RECOMMENDATION**

        Respondent.     )

_____)

       This is a habeas corpus proceeding brought by a state prisoner, through retained counsel, under 28 U.S.C. § 2254.  Petitioner is serving a sentence of 85-to-480 months on one count of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b(1)(a), concurrent terms of 60-to-180 months on two counts of second-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520c(1)(a), and a term of 32-to-48 months on accosting a child for immoral purposes, MICH. COMP. LAWS § 750.145a.  The Barry County Circuit Court imposed sentence on October 14, 2003, after a jury convicted petitioner of these charges, which arose from allegations that he molested his eight-year-old niece, H.R., in the early morning hours of June 29, 2003.

       The habeas corpus petition alleges two separate grounds for relief, both arising from alleged ineffective assistance of counsel.  First, petitioner alleges that his retained trial counsel was ineffective for giving him gross misinformation and misadvice concerning a plea offer presented by the prosecutor before the preliminary examination.  Second, petitioner asserts that his counsel's performance at trial was ineffective on a number of grounds, including failure to consult with or present an expert witness, failure to object to inadmissible evidence, and failure to present a viable defense.  Petitioner presented both of these claims to the Michigan circuit court in a post-trial

*Ginther* hearing, *see People v. Ginther*, 212 N.W.2d 922 (Mich. 1973), which is the vehicle by which a criminal defendant may establish an evidentiary record for claims of ineffective assistance of counsel.  The *Ginther* hearing demonstrated that petitioner's retained trial counsel did indeed give him gross misinformation concerning the nature and consequences of the prosecutor's plea offer. Both the trial court and the Michigan Court of Appeals found, however, that petitioner had failed to establish by a preponderance of the evidence that he would have accepted the plea proposal if it had been properly communicated and explained to him.

This matter has been referred to me for review of the record and the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 10 of the Rules Governing Section 2254 Proceedings in the District Courts.  After review of the record, I conclude that the decision of the Michigan courts on petitioner's first ground for relief is contrary to clearly established federal law.  I therefore recommend the issuance of a conditional writ of habeas corpus on ground 1 of the petition.  Because of this recommended disposition, I do not reach the second ground, which asserts ineffective assistance of counsel at trial.

## Prefatory Note

Proper analysis of petitioner's first claim for habeas corpus relief requires an understanding of Michigan law governing plea agreements, which differs in material respects from federal-court practice.

In *People v. Killibrew*, 330 N.W.2d 834 (Mich. 1982), the state Supreme Court established that sentence bargaining is acceptable in Michigan criminal practice.  The court held that the trial judge "may not become involved in the negotiation of the bargain."  330 N.W.2d at 836. The judge's role is limited to consideration of the bargain between the defendant and the prosecutor.

*Id.* Even so, if the court chooses not to follow the prosecutor's sentence recommendation, the defendant "must be given the opportunity to withdraw his guilty plea." As a consequence, all plea recommendations negotiated between the defendant and the prosecutor are "binding" in the sense that the defendant must be given the opportunity to withdraw his guilty plea and proceed to trial if the court does not accept the prosecutor's recommendation.

This contrasts with federal-court practice. Under Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the prosecutor may make a sentencing recommendation, but the recommendation is expressly not binding on the court. *See United States v. Davidson*, 409 F.3d 304, 310-12 (6th Cir. 2005). The defendant therefore has no opportunity to withdraw his guilty plea if the court declines to accept the recommendation. Under Rule 11(c)(1)(C), the prosecutor may make a binding plea agreement. If the court rejects a binding plea agreement, it must give the defendant an opportunity to withdraw the plea. *See United States v. Skidmore*, 998 F.2d 372, 375 (6th Cir. 1993). Consequently, under Michigan practice, all pleas based on a prosecutorial sentencing recommendation are equivalent to federal pleas under Rule 11(c)(1)(C). In Michigan, there is no such thing as a non-binding plea recommendation.

In *People v. Cobbs*, 505 N.W.2d 208 (Mich. 1993), the state Supreme Court expanded the legitimate role of the trial judge. Under *Cobbs*, at the request of a party, the judge "may state on the record the length of sentence that, on the basis of the information then available to the judge, appears to be appropriate for the charged offense." 505 N.W.2d at 212. This preliminary evaluation does not, however, bind the judge at the time of sentencing. After reviewing the presentence report, the judge may adhere to the initial assessment or not. If the sentencing judge refuses to impose

sentence in accordance with the initial assessment, defendant must be given an opportunity to withdraw the plea.  *Id.*[1]

By the time the parties in the present case were engaged in plea negotiations (December 2002), the difference between a *Killibrew* plea and a *Cobbs* plea was well established in Michigan law.  In *People v. Williams*, 626 N.W.2d 899 (Mich. 2001), the court reiterated that in cases involving sentencing recommendations under *Killibrew*, "the neutrality of the judge is maintained because the recommendation is entirely the product of an agreement between the prosecutor and the defendant."  626 N.W.2d at 902.  Consequently, the judge's first involvement with the sentence is at the time of sentencing, and the judge is not in any sense involved in the plea-bargaining process.  *Id.*  "By contrast, the degree of the judge's participation in a *Cobbs* plea is considerably greater, with the judge having made the initial assessment at the request of one of the parties, and with the defendant having made the decision to offer the plea in light of that assessment."  *Id.*

An understanding of this terminology is necessary for analysis of this case, because the prosecutor testified that the plea agreement he offered at the preliminary examination was expressly a "*Killibrew*" plea.

---

[1] In 2005, the Michigan court rules were amended to codify the requirements of *Killibrew* and *Cobb*.  MICH. CT. R. 6.310(B)(2).

## Proposed Findings of Fact

**A.      Summary of Trial Evidence**

It is unnecessary for purposes of this report and recommendation to review the trial evidence extensively.  The summary contained in the opinion of the Michigan Court of Appeals is accurate and will suffice for present purposes:

The prosecution alleged that defendant had sexually abused his niece who was then eight years old.  The victim testified that she and her cousins all slept in defendant's living room, and that she woke up early on June 29, 2003, and that defendant walked into the living room naked and spoke to her.  The victim stated that defendant gave her a chest massage and a back massage.  The victim testified that defendant touched her private chest area; he put his hand under her shirt, and then he tickled her tummy, saying that although she was getting to be a big girl, he could still tickle her.  She explained that defendant then went upstairs, saying that he was going to get something fun to play with.  The victim claimed she was sure her cousins were not awake because she looked at them while defendant was upstairs.  The victim testified that defendant came back and sat next her [sic], directed her to lie down and put her head on his leg, at which time he pulled her shorts and underwear away and touched her private part with a "vibrating machine."  The victim testified that defendant then used his fingers to "open me up down there" and put the vibrator inside of her.  The victim told defendant she did not like it and he stopped.  The victim testified that defendant then asked her if she wanted to go into the computer room, so she did with defendant who was still naked.  There, according to the victim, defendant asked if she wanted to see him, but also stated that it was okay if she just wanted to go lie down.  The victim told defendant she did not want to see him, returned to the living room, and laid down in the couch.  According to the victim, defendant followed her into the living room and reminded her not to tell anyone, but if she wanted to talk about it with someone she should talk to her cousin [B.L.].  The victim further testified that when she was back on the couch again, defendant told her not to look until he had left.  The victim opened her eyes when she thought defendant had left, but he was still standing there grabbing his private part "and started wiggling it."

[D.R.], the victim's mother, stated that on the evening of June 29, 2003, as soon as she returned home from picking up the victim, she went into the bathroom to get ready for bed, and the victim followed her in and told her that "[defendant] touched me down there," gestured toward her private area, and said that defendant did other stuff too.  [D.R.] testified that she asked what other stuff defendant did, and the victim stated that defendant had a "vibrating handlebar machine," and told her what defendant did with it.  [D.R.] further testified that the victim told her about

defendant wanting her to look at him and that defendant touched himself while he was using the vibrating machine.

[D.R.] stated that she called defendant that night and asked him what was going on, and that defendant denied using a vibrator on the victim, then gave the phone to his wife and [D.R.'s] sister Sheri Leatherman. When [D.R.] told Sheri about the vibrator, [D.R.] stated that she could hear defendant in the background saying, "Do you think the girls' [sic] might have found it?" According to [D.R.], Sheri said she had a vibrator, but would have known if defendant removed it because it was kept under the mattress on the side of the bed that Sheri slept.[1]

David Oakland, a Barry County Sheriff's Officer, testified that the initial report of abuse came in at 10:34 p.m. on June 29, 2003. A search warrant was obtained for defendant's home, and executed on July 1, 2003. The vibrator was not found.

Ruth Westfall conducted a forensic interview on July 3, 2003. Westfall testified that she asked the victim open-ended questions and when the victim brought up something that happened to her, Westfall would tell her to relate everything that happened. Westfall testified that the victim used age appropriate words and "did a very good job in describing the event." Westfall stated that she did not see any indication of the victim being coached; "if she had been coached, then she would be using words too big for her age or wouldn't be able to give all the details."

Dr. Debra Simms, testified that on July 31, 2003, she examined the victim, and that the victim appeared bright and able to articulate what had happened. Dr. Simms testified that the victim told her the vibrator was a black and gold machine that defendant put inside of her, and that the victim gave a "very clear, consistent, and detailed description of being molested." Dr. Simms noted that the victim's testimony to her was consistent with labial penetration. Dr. Simms determined that there were no physical findings indicating abuse, but her overall assessment, which included discussions with the victim, her mother, past professional experience, and medical history, was of "probable abuse."

Defendant stated that two of his daughters and the victim wanted to be tickled, so he tickled the girls before he went to work. Defendant further stated that he was never naked in front of the victim and did not have a vibrator. Defendant emphatically denied sexually assaulting the victim.

————————

[1] Sheri denied that defendant ever expressed a concern that the girls might have found something, and stated that she never told anyone she had a vibrator under her side of the bed.

(Op. at 1-3, found in Mich. Ct. App. Record, docket # 18).

The jury found petitioner guilty on all four counts.  Petitioner, represented by new counsel Anastase Markou, filed a motion for new trial and requested a *Ginther* hearing to establish that previous counsel had been constitutionally ineffective for failing to advise him adequately of plea offers, failing to consult and call an expert witness regarding the victim's ability to fabricate the allegations, and other trial errors.

### B.   *Ginther* Hearing

On October 4, 2004, the trial judge conducted a *Ginther* hearing.  (*See* Transcript of *Ginther* Hearing (GH), docket # 17).  At the hearing, the court took testimony from defense attorney James Champion, Katherine Okla (an expert in forensic examination of child sex abuse victims), petitioner, petitioner's wife, and Gordon Shane McNeill (the assistant prosecutor).  The following summary relates only to that part of the *Ginther* hearing devoted to petitioner's claim that Mr. Champion failed to advise him properly concerning the prosecutor's plea offer.

Assistant Prosecutor McNeill testified that he tendered a plea offer to defense counsel Champion on the day of the preliminary examination.  (GH, 91).  McNeill formulated the plea offer after speaking with the victim and her parents.  (GH, 92).  McNeill offered to allow petitioner to plead guilty to second-degree criminal sexual conduct "with a *Killibrew* of probation, which included up to twelve months in jail."  (GH, 92).[2]  Mr. Champion said he would talk to his client.  After about five minutes, McNeill entered the courtroom and asked Champion whether the case would be

---

[2] Unfortunately, the assistant prosecutor couched his testimony in courthouse jargon, rather than standard English.  The meaning of his testimony, however, is clear if the reader understands Michigan law.  The prosecutor would have recommended a sentence of probation, including a jail term capped at twelve months.  The reference to "*Killibrew*" meant that petitioner would have had the right to withdraw his guilty plea in the event the court rejected the sentencing recommendation.

resolved. Champion responded, "We're gonna have a prelim." (*Id.*). McNeill said, loudly enough for petitioner to hear, that the plea offer would be withdrawn if the victim had to testify. (*Id.*, 92, 94). Mr. McNeill could not be certain, however, that petitioner heard him. (*Id.*, 94, 98). When asked at the *Ginther* hearing about the acceptability to the prosecution of a *nolo contendere* plea, McNeill testified he generally did not care if the plea was guilty or no contest, but that there was never any discussion of this point because there was "never any indication from Mr. Champion that Mr. Leatherman was seriously interested in a plea agreement." (GH, 92-93).

Mr. McNeill again discussed a plea agreement to defense counsel on the day of the circuit court pretrial conference. At that point, Mr. Champion was interested in entering into a *Killibrew* plea to second-degree CSC, with a recommendation of probation and a twelve-month jail cap. (GH, 96). This was the same plea offered at the preliminary examination, but the prosecutor was no longer willing to agree to this disposition of the case. The prosecutor made an offer under which petitioner would plead guilty to both second-degree criminal sexual conduct and to accosting a minor for immoral purposes. He reiterated that he was no longer willing to enter into a *Killibrew* plea. "I did not *Killibrew* it. . . ." (GH, 96). He said he would be open to a plea under *People v. Cobbs* (pursuant to which the judge would be asked to express a tentative sentence). (GH, 99-100). Both counsel spoke to the judge, who was "noncommittal." "So there was no *Cobbs* agreement as far as this is what I will do." (GH, 100). No plea agreement was reached.

Both the offer extended at the preliminary examination and the offer extended at the pretrial conference were memorialized in the "Criminal Pretrial Summary and Scheduling Order" dated September 11, 2003. (Ex. 2 to Petitioner's Memorandum of Law, docket # 2). Under the heading "Prosecutor Will Offer," the summary scheduling order stated:

Offered CSC 2nd w/prob cap at prelim.  Def. rejected; current offer done at pretrial
CSC 2d + count 4 w/no sentence agreement; polygraph still offered.

Defense counsel, James Champion, testified that plea discussions began at the
courthouse on the day of the preliminary examination.  (GH, 17).  Champion testified that the offer
at that time was that petitioner would plead guilty to second-degree criminal sexual conduct, a
probationable offense.  Champion told his client, however, that the prosecutor's plea "in no way took
prison off the table."  (*Id.*).  He believed that the offer was an indication of the weakness of the
prosecutor's case and thought that there was merit in proceeding with the preliminary examination.
He counseled his client that the offers would get better as the case progressed.  (GH, 18-19).  His
recommendation "was to continue forward" with the preliminary examination.   (GH, 20).
Champion's testimony established that he did not tell his client that the prosecution had offered
probation plus a jail term with a twelve-month cap, or that petitioner would have an absolute right
to withdraw his guilty plea if the judge rejected that sentencing recommendation. (GH, 21).  In fact,
Champion's advice to his client was completely contrary to the prosecutor's offer of a *Killibrew* plea,
in that he told petitioner that prison was off the table only between the prosecutor and defense
counsel, "but not as far as the judge was concerned."  (GH, 20-21).  He told his client that the
sentence would be under the Guidelines, but did not explain what the Guidelines were for either
criminal sexual conduct, second-degree, or the more serious charge of CSC, first-degree.  (GH, 21-
23).

Mrs. Leatherman testified that she was present at the preliminary examination, when
defense counsel relayed the plea offer to her husband.  (GH, 69).  She understood that the offer
involved a sentence of 3-to-6 years in prison.  (GH, 69-70).  Counsel did not explain the sentencing
guidelines.  (GH, 70).  Mrs. Leatherman also described the financial arrangement with attorney

Champion, who demanded a $4,000 retainer, $6,000 more for the preliminary examination, and another $10,000 "to get the ball rolling" for trial. (GH, 71). By the time of the final pretrial conference, her husband was willing to plead guilty and accept a probationary sentence, to spare the family a trial. (GH, 86, 88).

Petitioner, Bradley Leatherman, testified concerning the plea discussions on the day of the preliminary examination, August 1, 2003. (GH, 102-03). He said that Mr. Champion indicated that the prosecution was offering a sentence of 3-to-6 years, but that Champion did not indicate the charge to which petitioner would be pleading guilty. (GH, 103). Counsel did not explain the sentencing guidelines or how they would affect the sentence, either after a plea or a trial. (GH, 103). Champion indicated that future offers would get better. Leatherman denied that he overheard any of the conversation between Champion and the assistant prosecutor concerning a plea agreement. (GH, 104).

Petitioner testified that he would have accepted an offer to plead no-contest to a charge of second-degree criminal sexual conduct, with a sentence of probation including a jail sentence of up to one year. (GH, 105). When asked why he would have accepted the offer, petitioner testified that he was "scared to death," and that he "would have been home." (GH, 105). He testified that he told Mr. Champion that he would be willing to take a plea offer if it involved "probation and some sort of local jail sentence." (GH, 106).

At the time of the circuit court pretrial, petitioner discussed a possible plea with Mr. Champion, who asked whether he would accept probation. Petitioner said that he would, and Champion commented that it would be a "no-brainer," and recommended it. (GH, 107). Champion

said that he would have to see whether "the judge will go for it."[3]  After a long while, Champion returned and said that the judge "won't go for it." (GH, 108).  Champion told him that the judge had "countered" indicating a sentence of 30-to-56 months on the second degree CSC charge and 85 months for the other three counts.  (GH, 108).  Petitioner was the only witness who testified that the judge had made any indication concerning a tentative sentence.  Petitioner and Mr. Champion agreed that this was "too much time."  (GH, 108).

At the hearing, Mr. Markou asked once again whether petitioner would have accepted a no-contest plea to criminal sexual conduct with the understanding that he would be placed on probation and "maybe do up to a year in jail."  Petitioner answered, "Absolutely." (GH, 108).

On cross-examination, the assistant prosecutor confronted petitioner with the fact that he had testified at trial and had denied committing any criminal act.  (GH, 115-16).  Under questioning about the underlying events, he testified that he never touched the victim in a sexual way.  (GH, 116-17).

During oral argument, the trial judge remarked to defense counsel that petitioner's position "sounds to me like Monday morning quarterbacking."  (GH, 122).  The court further remarked that no one had explained to its satisfaction "that this gentleman was ever willing to enter a plea that involved him being incarcerated," emphasizing that petitioner had testified that he did not want to be separated from his family.  (GH, 123-24).  Counsel responded that petitioner had never been given the opportunity to make that decision, because Champion had admittedly never

---

[3] This is consistent with the assistant prosecutor's testimony.  The assistant prosecutor testified that by the time of the final pretrial conference he was no longer willing to make any recommendation concerning sentence.  The only remaining option for a defendant who seeks some indication of the probable sentence would therefore have been a *Cobbs* plea, pursuant to which the sentencing judge indicates a tentative sentence.

communicated an accurate understanding of the prosecutor's plea agreement.  (GH, 124).  The judge then expressed skepticism that he would have been able to accept a plea  from a defendant who had maintained his innocence throughout the case.  (GH, 124).  Counsel responded that a no-contest plea would have been available in that circumstance.  The court persisted in its notion that petitioner's position was inconsistent with his protestations of innocence and that accepting a no-contest plea would involve the court in a "fraud."  (GH, 125).[4]  The court further indicated that it would set aside a guilty plea "on my own volition" if it appeared that the defendant merely pled guilty to avoid a harsher sentence.  (GH, 126).  After further argument, the court's remarks returned to the concept that petitioner had decided to "roll the dice" with a trial and now was seeking a second chance because he "came up with snake eyes the first time."  (GH, 130).

After hearing further argument, the court made an oral ruling.  The court made no clear finding of fact concerning the question whether Mr. Champion had accurately conveyed the terms of the plea offer on the day of the preliminary examination, except to observe, contrary to all the evidence, that it was "more likely than not" that petitioner was advised of the plea offer.  (GH, 138, 142).  The court went on to hold, in conclusory fashion, that petitioner had not shown prejudice, stating:

> The -- the -- the biggest problem, though, is of a failure to show any prejudice.  The defendant repeated today during his testimony, I couldn't take the chance of being separated from my family.  There is no explanation of what probation meant, but it seems to me that he thought probation meant no jail.  And that was never on the table, ever.

---

[4] The trial judge went so far as to remark that defense counsel has no obligation to explain the sentencing guidelines to a defendant who maintains his innocence.  (GH, 131).

(GH, 142).  On the basis of those comments, the court rejected petitioner's claim of ineffective assistance arising from counsel's failure to convey the plea offer.  In separate rulings, the court rejected petitioner's claim of ineffective assistance of counsel at trial.

### C.     Appellate Proceedings

Petitioner appealed as of right to the Michigan Court of Appeals.  His appellate counsel raised the same Sixth Amendment claims raised in the trial court and explored at the *Ginther* hearing.  By opinion issued June 30, 2005, a panel of the Michigan Court of Appeals reviewed and rejected all petitioner's Sixth Amendment claims.  In reviewing these claims, the Court of Appeals acknowledged the relevant federal standard, pursuant to which a criminal defendant must show both that counsel's performance fell below an objective standard of reasonableness and that there is "a reasonable probability that, but for counsel's error, the result of the proceedings would have been different."  (Op. at 4, citing *Bell v. Cone*, 535 U.S. 685, 695 (2002)).

In the next paragraph of its opinion, the Court of Appeals began its analysis of petitioner's claim arising from the failure to advise him of the plea offer.  The court recognized that failure "to adequately communicate a plea offer may constitute ineffective assistance of counsel." (Op., 4).  The court then deviated from the federal standard it had just enunciated, stating that "defendant must prove by a preponderance of the evidence that an offer was made, that his attorney failed to communicate the offer, and that he was prejudiced, *i.e.*, that he would have accepted the offer."  (Op., 4).  The court cited *People v. Robert Williams*, 429 N.W.2d 649, 652 (Mich. Ct. App. 1988), which indeed applied the "preponderance of the evidence" standard rather than the "reasonable probability" standard enunciated by the United States Supreme Court.

Unlike the trial court, the Court of Appeals made clear findings of fact concerning Mr. Champion's failure to convey the plea offer at the preliminary examination.

- "There is no question that an offer was made."

- "There was no policy prohibiting a no-contest plea and the trial prosecutor indicated that it would not have been an impediment to a plea agreement going forward."

- "Defense counsel did not fully articulate the prosecution's plea offer to defendant."

- "Defense counsel also testified that he did not believe that he explained the sentencing guidelines to defendant as they applied to a plea offer or to his maximum sentence if convicted at trial for first-degree CSC. . . ."

- "[Defense counsel] did not understand that the prosecution was offering a probation cap, *i.e.*, a sentencing agreement."

- "Defense counsel only stated that he told defendant that prison was not off the table."

- "Defense counsel's testimony is devoid of any understanding that the first offer was for a *Killibrew* plea, and thus, there was no discussion with defendant about what this meant."

(Op., 4-5). Thus, the appellate court tacitly rejected the trial court's observation that defense counsel likely conveyed the offer at the preliminary examination.

The court went on to find, however, that petitioner failed in his burden to show by a preponderance of the evidence that he would have accepted the plea. The court found that petitioner's testimony at the *Ginther* hearing indicated that he did not want to be put behind bars as part of his sentence. The court also remarked that the difference in the sentence under the proffered plea offer and the defendant's actual sentence is "irrelevant." (Op., 5 n.4). The Court of Appeals therefore rejected petitioner's claim, for lack of an adequate showing of prejudice. "Therefore, we conclude that the trial court did not err in finding that defendant did not prove prejudice by a

-14-

*preponderance of the evidence.*"  (Op., 5, emphasis added).  The court then went on to analyze and

reject petitioner's claims of ineffective assistance of counsel at trial and other claims of trial error.

Petitioner, acting through retained counsel, sought discretionary review from the

Michigan Supreme Court.  The Supreme Court denied leave to appeal on January 27, 2006.  This

habeas corpus action followed.


### Applicable Standard

Because petitioner filed his habeas application long after the April 1996 enactment

of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"),

the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S.

782, 791 (2001), *cert. denied sub nom.*, *Texas v. Penry*, 547 U.S. 1200 (2006); *Wilson v. Parker*, 515

F.3d 682, 691 (6th Cir. 2008).  The AEDPA has "drastically changed" the nature of habeas review.

*Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  AEDPA "dictates a highly deferential standard

for evaluating state-court rulings which demands that state court decisions be given the benefit of

the doubt."  *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Wilkins v. Timmerman-

Cooper*, 512 F.3d 768, 774 (6th Cir. 2008).  "AEDPA requires heightened respect for state court

factual and legal determinations."  *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006).  If a

state court adjudicated the claim, deferential AEDPA standards must be applied.  28 U.S.C. §

2254(d).  Even if a state court disposes of a constitutional claim without articulating its analysis,

deferential review is required.  The Sixth Circuit describes the review AEDPA requires under such

circumstances as "modified AEDPA deference." *Vasquez v. Jones*, 496 F.3d 564, 569-70 (6th Cir.

2007); *Moldonado v. Wilson*, 416 F.3d 470, 475-76 (6th Cir. 2005); *Howard v. Bouchard*, 405 F.3d

459, 467 (6th Cir. 2005).  Under the modified standard, "a federal habeas court must conduct an

independent review of the record and applicable law to determine whether, under the AEDPA standard, the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. The independent review, however, is not a full *de novo* review of the claims. As we held in *Harris* [*v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)], this standard of review requires the court to conduct a careful review of the record and applicable law, but nonetheless, bars the court from reversing unless the state court's decision is contrary to or an unreasonable application of federal law." *Maldonado*, 416 F.3d at 476. *De novo* review is restricted to instances where the state court did not address the merits of a claim. In that limited set of circumstances, "there are simply no results, let alone reasoning, to which [the habeas] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Van v. Jones*, 475 F.3d 292, 293 (6th Cir.), *cert. denied*, 128 S. Ct. 708 (2007); *Williams v. Anderson*, 460 F.3d 789, 796 (6th Cir. 2006); *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005) ("[W]hen a claim has not been adjudicated on the merits in State Court proceedings, and has not been procedurally defaulted, we look at the claim *de novo* rather than through the deferential lens of AEDPA.") (citations omitted); *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005).

The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based

upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted). A federal court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001).

"It is important to note, however, that 'an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.'" *Harbison v. Bell*, 408 F.3d 823, 829 (6th Cir. 2005)(quoting *Williams*, 529 U.S. at 409). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *see Walls v. Kontech*, 490 F.3d 432, 436 (6th Cir. 2007); *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410; *see Bell v. Cone*, 535 U.S. at 694; *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006)("The proper inquiry under the 'unreasonable application' analysis is whether the state court decision was objectively unreasonable

and not simply erroneous or incorrect."), *cert. denied sub. nom. Keith v. Houck*, 127 S. Ct. 1881 (2007); *Payne v. Bell*, 418 F.3d 644, 653 (6th Cir. 2005)("A state court decision involves an 'unreasonable application' of clearly established Supreme Court precedent when it correctly identifies the governing legal standard but applies it to the facts before it in an objectively unreasonable manner.")(citations omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. at 412; *Wilson v. Parker*, 515 F.3d at 691; *Ross v. Petro*, 515 F.3d 653, 660 (6th Cir. 2008). This court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d at 943.

The AEDPA standard includes an important temporal limitation. "'[C]learly established Federal law as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003)(quoting *Williams*, 529 U.S. at 412); *see Fautenberry v. Mitchell*, 515 F.3d 614, 623 (6th Cir. 2008). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004)(describing the issue of whether the law was clearly established by Supreme Court

precedent as a "threshold inquiry").  "'Federal Courts are not free to presume that a state court did

not comply with constitutional dictates on the basis of nothing more than a lack of citation.'" *Payne*,

418 F.3d at 656 (quoting *Cone v. Bell*, 543 U.S. at  455).   "The state court decision need not cite

Supreme Court precedent, or even reflect awareness of Supreme Court cases, 'so long as neither the

reasoning nor the result of the state court decision contradicts them.'"  *Dennis*, 354 F.3d at 517-18

(quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires

heightened respect for state factual findings.  28 U.S.C. § 2254(e)(1); *see Herbert v. Billy*, 160 F.3d

1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to

be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing

evidence 28 U.S.C. § 2254(e)(1); *Ivory v. Jackson*, 509 F.3d 284, 291 (6th Cir. 2007), *cert. denied*,

128 S. Ct. 1897 (2008); *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007); *Sinkfield v. Brigano*,

487 F.3d 1013, 1016 (6th Cir.), *cert. denied*, 128 S. Ct. 401 (2007).  This presumption of correctness

is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449

U.S. 539, 546 (1981); *Lundgren v. Mitchell*, 440 F.3d 754,  763 (6th Cir. 2006).

## Discussion

**I.    Ineffective Assistance of Counsel in Plea Negotiations**

A.    "Clearly Established" Federal Right to Assistance of Counsel

To establish ineffective assistance of counsel a habeas petitioner must demonstrate:

(1) counsel's performance fell below an objective standard of reasonableness and did not represent

sound legal strategy (the "performance prong"); and (2) counsel's deficient performance prejudiced

petitioner, resulting in an unreliable or fundamentally unfair outcome (the "prejudice prong").

*Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  To prevail on the second, or prejudice, prong of the *Strickland* standard, a petitioner "must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. at 694.  A habeas petitioner must establish that the decision of the state courts on these issues was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  28 U.S.C. § 2254(d).

At the outset, respondent argues that AEDPA bars relief in this case, because "the Supreme Court has never considered a habeas case involving the failure to relay a plea offer." (Answer, docket # 10, at 10).  Respondent therefore asserts that the right claimed by petitioner in the present case is not "clearly established" by a holding of the United States Supreme Court and that a grant of relief to petitioner would require the court to extend the law beyond that recognized by the Supreme Court, in violation of AEDPA.  Respondent's argument is not meritorious.  The Supreme Court has long held that the right to the effective assistance of counsel extends to every critical stage of a criminal case.  *See Gardner v. Florida*, 430 U.S. 349, 358 (1977); *Mempa v. Rhay*, 389 U.S. 128, 134 (1967).  Further, in *Hill v. Lockhart*, 474 U.S. 52 (1985), the Court held that the *Strickland* standard applies to a habeas corpus petitioner who seeks to set aside his plea of guilty on the ground of ineffective assistance of counsel in connection with the plea.  Consequently, if there were any doubt before *Hill*, *Hill* clearly establishes a criminal defendant's right to the effective assistance of counsel in deciding whether or not to enter a plea of guilty.

*Hill* involved a challenge to a plea of guilty based on ineffective assistance of counsel. Respondent is correct that the Supreme Court has never squarely faced a case involving counsel's ineffective assistance for failing to relay a plea offer.  Respondent reads the AEDPA rule too narrowly, however.  In the landmark case of *Williams v. Taylor*, 529 U.S. 362 (2000), the Court

-20-

examined a claim of ineffective assistance of counsel arising from an attorney's alleged failure to

discover and present mitigating evidence during the penalty phase of a capital case.  Although no

Supreme Court holding on the precise issue existed, the Court held that the merits of the claim were

governed by *Strickland v. Washington*, which constitutes "clearly established federal law," within

the meaning of AEDPA.  529 U.S. at 390-91.  The Court noted that the *Strickland* test of necessity

requires a case-by-case examination of the evidence, but that this does not obviate either the clarity

of the rule or the extent to which the rule must be viewed as "established" by the Supreme Court.

*Id.* at 391.  The Court has also stated that "clearly established" law includes not only bright-line

rules, but also "the governing legal principle or principles set forth by the Supreme Court" designed

to apply to a range of factual contexts.  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).  An explicit

statement from the Supreme Court is not necessary; rather, "the legal principles and standards

flowing from [Supreme Court] precedent" also qualify as clearly established law.  *Ruimveld v.

Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  Consequently, habeas relief under AEDPA does not

require that a holding of the Supreme Court direct relief in an identical case; all that is required is

that the Supreme Court's holding clearly establish the *principle* upon which petitioner relies.  *Id.*

On the basis of the foregoing authorities, I conclude that by the year 2003, when the

trial court conducted its *Ginther* hearing, the Supreme Court had clearly established the principle that

the Sixth Amendment guarantees to all criminal defendants the effective assistance of counsel in

connection with the decision whether to accept or reject a plea offer from the prosecutor.  The federal

courts of appeals have come to the same conclusion, either expressly or implicitly.  For example, the

Ninth Circuit in *Nunes v. Miller*, 350 F.3d 1045, 1051-53 (9th Cir. 2003), expressly rejected the

argument that *Hill v. Lockhart* only applies to habeas challenges to the validity of a guilty plea.

Rather, Supreme Court authority clearly establishes a defendant's right to the effective assistance

of counsel at all critical stages of a prosecution and will support a habeas claim based upon counsel's alleged failure to convey a plea offer.  350 F.3d at 1051-53.  The Seventh Circuit has likewise applied *Hill v. Lockhart* to a petitioner's claim that counsel had incorrectly advised him concerning the possible sentence, leading to his rejection of a plea offer.  *Julian v. Bartley*, 495 F.3d 487, 494-95 (7th Cir. 2007).  More importantly for our purposes, the Sixth Circuit Court of Appeals has ordered relief under AEDPA to a habeas petitioner who claimed that his counsel was ineffective for encouraging him to reject a plea bargain and to go to trial.  *Magana v. Hofbauer*, 263 F.3d 542 (6th Cir. 2001).  This result would have been impossible had the Supreme Court not clearly established the underlying principle upon which petitioner relied.  *Accord, Hoffman v. Herbert*, 176 F. App'x 166, 167 (2d Cir. 2006) (standard for ineffective assistance of counsel was clearly established by *Strickland* for purposes of AEDPA, even if Supreme Court had not yet articulated its application to precise facts alleged by petitioner, whose counsel had failed to convey a plea offer).

> For the foregoing reasons, I conclude that a Sixth Amendment right to the effective assistance of counsel in connection with plea offers has been clearly established by the Supreme Court of the United States and is available to petitioner in this case.

## B.    AEDPA Deference to State-Court Determinations

> Under AEDPA, both the legal and factual determinations of the state courts are entitled to deference.  A habeas court may overcome a state-court legal finding only if it is contrary to or represents an unreasonable application of clearly established federal law.  *See Williams*, 529 U.S. at 407.  The issue in this regard is whether the state courts' application of clearly established federal law is "objectively unreasonable."  *Id.* at 410.  State-court factual findings are presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing

evidence. 28 U.S.C. § 2254(e)(1). This presumption of correctness, however, applies only to basic, primary, or historical facts and not to mixed questions of law and fact, which are reviewed *de novo*. *See Powell v. Collins*, 332 F.3d 376, 389 (6th Cir. 2003). Even under this lenient standard, the findings of the state courts do not withstand scrutiny.

The state trial court made findings of a sort on both prongs of the *Strickland* standard. On the performance prong, the trial court found that it was "more likely than not" that the defendant was advised of the plea offers. (GH, 143). The trial court cited no supporting evidence for these findings, nor could it. The assistant prosecutor clearly testified that he offered defense counsel a plea agreement, under which defendant would plead guilty to second-degree CSC, with a recommendation of probation including a term of up to twelve months in jail. Defense counsel just as clearly testified that he did not convey this offer to his client, and petitioner and his wife confirmed that testimony. It is telling that the Court of Appeals essentially ignored the trial judge's factual finding in this regard and made its own findings, concluding that defense counsel clearly did not convey the prosecutor's offer accurately. In these circumstances, the trial judge's factual finding on the performance prong of *Strickland* has been overcome by clear and convincing evidence.

The trial judge made no finding of "basic, primary or historical facts" with regard to the prejudice prong of *Strickland*. In other words, the court did not determine whether petitioner had established a reasonable probability that, but for counsel's misadvice, he would have accepted the plea offer. Rather, the trial court made a conclusory finding that petitioner had not shown prejudice, but made clear its opinion that petitioner was legally precluded from entering a guilty plea because he maintained his innocence throughout the proceedings. The court remarked that the entry of a guilty plea in these circumstances would have been a fraud and that a *nolo contendere* plea cannot be entered by a defendant who maintains his innocence. The trial judge did not cite any authority

-23-

for these remarkable conclusions.  Certainly, they have no foundation in either state or federal law.

The assistant prosecutor testified that he would not have objected to the entry of a *nolo contendere*

plea (GH, 92-93), and the state Court of Appeals found that there was no policy prohibiting such a

plea in the circumstances (Op., 4).  Such pleas are expressly allowed by Michigan law.  MICH. CT.

R. 6.302(A).  The Michigan courts have long recognized that a plea of *nolo contendere* is available

to a defendant who wishes to avoid making any admission.  *See People v. Johnson*, 329 N.W.2d 520,

521 (Mich. Ct. App. 1982).  The only procedural requirement imposed by Michigan law is that the

trial court state on the record why a plea of *nolo contendere* is appropriate.  MICH. CT. R.

6.302(D)(2)(a).  The defendant pleading *nolo contendere* is not required to admit the factual basis

for his plea.  Rather, the court must establish support for a finding of guilt on the basis of other

reliable evidence.  MICH. CT. R. 6.302(D)(2)(b); *see People v. Patmore*, 693 N.W.2d 385, 392

(Mich. Ct. App. 2004).  No Michigan case holds that a defendant who maintains his innocence is

precluded from entering a plea of guilty or *nolo contendere* in order to avail himself of a beneficial

plea agreement and avoid a more serious penalty after trial.

> The Sixth Circuit has repeatedly rejected the argument employed by the trial judge:

> Griffin's repeated declarations of innocence do not prove, as the government claims, that he would not have accepted a guilty plea.  *See North Carolina v. Alford*, 400 U.S. 25, 33, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) ("reasons other than the fact that he is guilty may induce a defendant to so plead, . . . and he must be permitted to judge for himself in this respect" quoting *State v. Kaufman*, 51 Iowa 578, 2 N.W. 275, 276 (Iowa 1879)).  Defendants must claim innocence right up to the point of accepting a guilty plea, or they would lose their ability to make any deal with the government.  It does not make sense to say that a defendant must admit guilt prior to accepting a deal on a guilty plea.  *It therefore does not make sense to say that a defendant's protestations of innocence belie his later claim that he would have accepted a guilty plea.*  Furthermore, a defendant must be entitled to maintain his innocence throughout trial under the Fifth Amendment.  Finally, Griffin could have possibly entered an *Alford* plea even while protesting his innocence.  *See id.*  These declarations of innocence are therefore not dispositive on the question of whether Griffin would have accepted the government's plea offer.

*Griffin v. United States*, 330 F.3d 733, 738 (6th Cir. 2003) (emphasis added).  In a later case, the Sixth Circuit observed that reliance on a defendant's maintenance of his innocence as a reason to conclude that he would not have accepted a plea "would inappropriately punish him for exercising his Fifth Amendment right against self-incrimination."  *United States v. Morris*, 470 F.3d 596, 603 (6th Cir. 2006).  The court condemned such reasoning as "at odds with this Court's precedents."  *Id.*  In summary, the trial court's finding that a plea of guilty or *nolo contendere* would have been unavailable to petitioner, because he had maintained his innocence throughout the proceeding, is legally untenable.

When the case reached the Michigan Court of Appeals, that court essentially ignored the trial court's factual findings on the performance prong of *Strickland*.  Instead, the court made its own findings of fact, clearly determining that an offer was made, that there was no policy prohibiting a no-contest plea, that defense counsel did not fully articulate the prosecution's plea offer to petitioner, that counsel did not explain the sentencing guidelines to petitioner as they applied to the plea offer or his maximum sentence if convicted at trial, and that defense counsel neither understood nor conveyed to petitioner that the prosecution was offering a sentencing agreement with a probation cap.  (Op., 4-5).  These findings clearly establish the performance prong under *Strickland*.  *See Griffin*, 330 F.3d at 737.  Furthermore, defense counsel's admitted failure to explain petitioner's sentencing exposure under the state guidelines and the range of penalties that he faced if he accepted or rejected the prosecutor's offer is an independent violation of the Sixth Amendment.  *See Magana*, 263 F.3d at 550 (holding that defense counsel's erroneous advice concerning sentence exposure "fell below an objective standard of reasonableness under prevailing professional norms."); *accord Smith v. United States*, 348 F.3d 545, 552-53 (6th Cir. 2003).

This leaves the prejudice prong of the *Strickland* test.  As noted in the Proposed Findings of Fact, the Court of Appeals acknowledged the federal standard, under which a defendant is required to show a "reasonable probability" that but for counsel's error the result of the proceedings would have been different.  (Op. at 4, *citing Bell v. Cone*, 535 U.S. 685, 695 (2002)). In the next paragraph of its opinion, however, the court deviated from the federal standard it had just enunciated, stating that "defendant must prove by a preponderance of the evidence that an offer was made, that his attorney failed to communicate the offer, and that he was prejudiced, *i.e.*, that he would have accepted the offer."  (Op., 4).  The court cited *People v. Robert Williams*, 429 N.W.2d 649, 652 (Mich. Ct. App. 1988), which indeed applied the "preponderance of the evidence" standard, rather than the "reasonable probability" standard enunciated the United States Supreme Court.  The court then found that petitioner had failed in his burden to establish by a preponderance of the evidence that he would have accepted the plea offer.  (Op., 5).

The Supreme Court itself has held that such an error by a state appellate court amounts to a decision that is "contrary to clearly established federal law."  In *Williams v. Taylor*, 529 U.S. 362 (2000), the Court foresaw the very error that the Michigan Court of Appeals made in this case:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.  Take, for example, our decision in *Strickland v. Washington*, 466 U.S. 668 (1984).  If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that . . . the result of the proceeding would have been different."  *Id.*, at 694.

529 U.S. at 406.  In light of this clear statement by the Supreme Court, this court is compelled to find that the Michigan Court of Appeals' application of the "preponderance of the evidence" standard is "contrary to" clearly established federal law.

Federal appellate courts faced with this same state-court error have come to the same conclusion.  In *Magana*, the Sixth Circuit Court of Appeals reviewed a habeas petition alleging gross misadvice concerning the petitioner's potential prison sentence, in which the Michigan Court of Appeals had determined that the petitioner had failed to prove by a preponderance of the evidence that he would have accepted the plea had he been properly advised.  The Court of Appeals found that the state appellate standard "placed too great a burden of proof on the defendant to show prejudice" and that the state decision deviated from the "reasonable probability" standard of the Supreme Court.  "'*Strickland v. Washington* does not require certainty or even a preponderance of the evidence that the outcome would have been different with effective assistance of counsel; it requires only 'reasonable probability' that that is the case.'"  263 F.3d at 550 (quoting *United States v. Day*, 969 F.2d 39, 45 n.8 (3d Cir. 1992)).  On this basis, the Court of Appeals found that the Michigan appellate court's decision was contrary to clearly established federal law.  Other federal appellate courts have also found that state-court determinations were "contrary to" the clearly established precedent of *Strickland v. Washington* by requiring a petitioner to prove prejudice by a preponderance of the evidence.  *See Rose v. Lee*, 252 F.3d 676, 689 (4th Cir. 2001); *Mask v. McGinnis*, 233 F.3d 132, 140 (2d Cir. 2000).

The decisions of the Supreme Court in *Woodford v. Visciotti*, 537 U.S. 19 (2003), and *Holland v. Jackson*, 542 U.S. 649 (2004), are not to the contrary.  In both cases, the Court reaffirmed the "reasonable probability" test for Sixth Amendment cases and disapproved the preponderance of the evidence standard.  The Court found in each case, however, that the federal circuit courts of

appeals had misconstrued the state-court opinions, which had articulated the correct standard but then contained ambiguous language, such as use of the word "probable" without the modifier "reasonably." *Woodford*, 537 U.S. at 23.  State-court decisions should be given the "benefit of the doubt." *Holland*, 542 U.S. at 655.  These cases counsel against imputing error to the state courts on the basis of ambiguous language in their opinions.  In the present case, however, the opinion of the Michigan Court of Appeals is unambiguous:  "Therefore, we conclude that the trial court did not err in finding that defendant did not prove prejudice by a preponderance of the evidence."  (Op., 5).  Neither *Woodford* nor *Holland* directs a habeas court to ignore the clear use of a patently erroneous standard by the state court.

In summary, the determinations of the trial court and Michigan Court of Appeals are not entitled to deference under AEDPA.  Review in this court must therefore be *de novo*.  *See Magana*, 263 F.3d at 551.

### C.    *De Novo* Review of Petitioner's Claims Under *Strickland*

Petitioner has the burden of establishing both that his counsel's performance was objectively unreasonable and that there is a "reasonable probability" that but for counsel's error, petitioner would have accepted the prosecutor's offer made at the preliminary examination.  The record establishes beyond a shadow of a doubt that defense counsel's performance was utterly incompetent in this regard, in that he failed both to comprehend the nature of the plea offer and to convey it to petitioner.  A defense attorney's failure to communicate a plea offer to his client constitutes deficient performance "as a matter of law." *Guerrero v. United States*, 383 F.3d 409, 416 (6th Cir. 2004).  Only the prejudice prong remains.

-28-

On *de novo* review, I find that petitioner has established a reasonable probability that, but for his counsel's failure to advise him properly of the nature of the prosecutor's plea offer, petitioner would have accepted the state's offer.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  "[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case."  *Id.* at 693.  The chance of prejudice need be only better than negligible.  *Julian v. Bartley*, 495 F.3d 487, 498 (7th Cir. 2007).  In the context of plea agreements, the prejudice prong focuses on whether the deficient information was the "decisive factor in a defendant's decision to plead guilty or to proceed to trial."  *Id.* (citing *Hill*, 474 U.S. at 58-59)).  In both habeas corpus cases and decisions on direct review, the Sixth Circuit Court of Appeals imposes a rather low burden on criminal defendants who have been induced to forego favorable plea offers by incompetent advice from counsel:

> Although some circuits have held that a defendant must support his own assertion that he would have accepted the offer with additional objective evidence, we in this circuit have declined to adopt such a requirement.  Nevertheless, it has been held, as the district court recognized, that a substantial disparity between the penalty offered by the prosecution and the punishment called for by the indictment is sufficient to establish a reasonable probability that a properly informed and advised defendant would have accepted the prosecution's offer.  It follows that the district court did not err in relying on such a disparity, along with the unrefuted testimony of the petitioner, to support its conclusion that the habeas relief was required in this case.

*Griffin v. United States*, 330 F.3d 733, 737-38 (6th Cir. 2003) (quoting *Dedvukovic v. Martin*, 36 F. App'x 795, 798 (6th Cir. 2002)).  In *Dedvukovic*, a habeas case, the court found that the reasonable probability standard had been met by clear evidence that the attorney failed to advise the petitioner of a plea offer, petitioner's testimony that he would have accepted it, and a "substantial disparity" between the penalty offered and the penalty imposed.  36 F. App'x at 797-98.  Other decisions of the Court of Appeals recognize the existence of a large sentencing disparity as the principal factor in favor of a finding for petitioner on the prejudice prong.  *See, e.g., United States v. Morris*, 470

-29-

F.3d 596, 602 (6th Cir. 2006) (Sixth Circuit gives "special weight" to significant disparities between penalties offered in a plea and penalties of a potential sentence in determining question of prejudice); *Magana*, 263 F.3d at 551-52.

Petitioner testified at the *Ginther* hearing that he "absolutely" would have accepted an offer to plead no contest to second-degree CSC, with a *Killibrew* recommendation of probation including the possibility of a one-year jail term. (GH, 105, 108). This testimony is bolstered by two objective factors. The first is the gross disparity between the recommended sentence of probation (including the possibility of one year in jail) and the maximum penalty that petitioner faced if found guilty of first-degree criminal sexual conduct: life imprisonment. MICH. COMP. LAWS § 750.520b(2). The disparity between probation and the sentence as imposed (7-to-12 years' imprisonment on the first-degree CSC conviction) was also significant. Under Sixth Circuit law, such a substantial disparity between the penalty offered by the prosecution and the punishment called for by the indictment "is sufficient to establish a reasonable probability that a properly informed and advised defendant would have accepted the prosecution's offer." *Griffin*, 330 F.3d at 738. Second, the record clearly establishes that when defense counsel suggested the identical plea agreement to petitioner at the time of the circuit court pretrial conference, petitioner instantly accepted the suggestion. (GH, 107-08). Defense counsel and the prosecutor therefore approached the judge to see whether he would agree to the sentence under *People v. Cobbs*, but they were not successful. (GH, 22-23). This fact dispels the inference that petitioner's interest in such a plea arose only after he lost at trial.

The Michigan Court of Appeals either discounted or ignored this objective evidence. With regard to the significant sentencing disparity, the Court of Appeals dismissed this factor as "irrelevant." (Op., 5 n.4). The court ignored the uncontroverted testimony demonstrating that

petitioner was eager, at the pretrial conference stage, to accept the very same offer that the prosecutor had extended (but which defense counsel failed to communicate) at the preliminary examination. Rather, the Court of Appeals concluded that petitioner would not have accepted any deal that included incarceration. The court focused on petitioner's testimony to the effect that he would have accepted the plea agreement because he did not want to be incarcerated. This represents a significant distortion of petitioner's testimony. Obviously, no one wants to go to either jail or prison, and petitioner admitted as much on cross-examination. Fairly read, petitioner's testimony cannot be understood as saying that he would have rejected the *possibility* of up to one year in jail in order to avoid a lengthy prison term if convicted. Petitioner was saying just the opposite. He testified that he was willing to take a plea offer that involved probation and some sort of local jail sentence and that defense counsel knew it. (GH, 106). The record simply does not support a finding that petitioner was unwilling to accept any plea agreement that included the possibility of jail time.

On *de novo* review, I find that the record made at the *Ginther* hearing clearly demonstrates a reasonable probability that petitioner would have accepted the plea agreement tendered by the prosecutor at the preliminary examination, had defense counsel properly conveyed it. Petitioner has therefore satisfied the burden imposed upon him by *Strickland v. Washington* to show both incompetent performance by counsel and a reasonable probability that, but for counsel's error, the result of the proceedings would have been different.

## II.    Remedy

The remedy for a Sixth Amendment violation "should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981). In a habeas corpus case involving

a similar Sixth Amendment violation, the Court of Appeals noted that the remedy should "neutralize" the constitutional deprivation suffered by the defendant. *Magana*, 363 F.3d at 553. More recently, the court held that "where the state extends a plea offer but simultaneously denies a defendant the effective assistance of counsel at the plea stage, a necessary part of the district court's remedial authority includes its ability to put the defendant back in the position he would have been [in] but for the ineffective assistance of counsel." *United States v. Morris*, 470 F.3d 596, 600 (6th Cir. 2006); *accord United States v. Allen*, 53 F. App'x 367, 373-74 (6th Cir. 2002) ("[I]f it were shown that defense counsel provided ineffective assistance, the remedy is to compel the government to reinstate the prior plea offer, restoring Mr. Allen to where he was before ineffective assistance was rendered.").

"Where, as here, a defendant receives a greater sentence than one contained in a plea offer that he would have accepted if not for the ineffective assistance of counsel, the properly tailored remedy is to give the defendant the opportunity to accept the offer, because simply retrying the petitioner without making the plea offer would not remedy the constitutional violation that led to the issuance of the writ." *Satterlee v. Wolfenbarger*, 453 F.3d 362, 370-71 n.7 (6th Cir. 2006). Application of this principle requires that the State of Michigan reinstate its offer to allow petitioner to plead *nolo contendere* to second-degree criminal CSC, with a recommendation of probation, including the possibility of up to one year in jail. The sentencing judge would not be bound to abide by this recommendation at sentencing. *See Killibrew*, 330 N.W.2d at 836. If the recommended sentence is rejected, the trial court must state the sentence that it intends to impose and provide the defendant with the opportunity to affirm the plea (and accept the new sentence) or withdraw the plea. MICH. CT. R. 6.310(B)(2)(a). This remedy places petitioner in precisely the same position he would have been in had counsel properly conveyed to him the terms of the plea agreement. There is no

authority for petitioner's request (Brief at 20) that this court "order the trial court to accept the plea agreement." Petitioner never had the right to compel the sentencing judge to accept any particular sentence. Petitioner was entitled only to accept the prosecutor's plea recommendation, with the knowledge that petitioner would have the option to withdraw his *nolo contendere* plea if the sentence actually imposed exceeded that recommended by the prosecutor. If petitioner does elect to withdraw his plea, he should be afforded a new trial on all charges. *See Julian v. Bartley*, 495 F.3d at 500.

### Recommended Disposition

For the foregoing reasons, I recommend that the petition for habeas corpus relief be granted and that a conditional writ be issued, including the following provisions:

A.    All petitioner's convictions and sentences in this matter must be vacated.

B.    The Barry County prosecutor must offer to resolve all charges by allowing petitioner to plead *nolo contendere* to a charge of second-degree criminal sexual conduct, with a recommendation of probation, including the possibility of up to one year in jail as a condition thereof.

C.    Petitioner must be granted the opportunity to affirm or withdraw his plea of *nolo contendere* if the sentence actually imposed exceeds the recommended sentence, as required by Mich. Ct. R. 6.310(B)(2)(a).

D.    If petitioner elects to withdraw his *nolo contendere* plea because the trial court has rejected the sentencing recommendation, petitioner must receive a retrial on all charges.

E.      Petitioner must be released from custody within 120 days of the date of final judgment herein if the State of Michigan does not comply with the requirements of the conditional writ.

Dated:  September 4, 2008          /s/  Joseph G. Scoville                      
                                            United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Neuman v. Rivers*, 125 F.3d 315, 322-23 (6th Cir.), *cert. denied*, 522 U.S. 1030 (1997); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).